**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| PETER GEORGE ODHIAMBO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-0441 (ABJ) |
| ) | |
| REPUBLIC OF KENYA, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM OPINION

Plaintiff Peter Odhiambo, a refugee from Kenya, brings this suit against defendants – the Republic of Kenya, the Kenya Ministry of Finance, the Kenya Revenue Authority ("KRA"), and the current and former KRA Commissioner Generals, John Njiraini and Michael Waweru, in their official capacities. He alleges two breach of contract claims arising from the KRA's offer to pay a reward in exchange for information about unpaid taxes due to the Republic of Kenya. Count I asserts that defendants failed to pay him the reward after he provided information about undisclosed taxes, and Count II contends that defendants improperly disclosed his identity as an informant. According to Odhiambo, the disclosure of his identity as a whistleblower forced him into hiding and ultimately caused him to seek and obtain asylum in the United States.

Defendants have moved to dismiss the action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the ground that they are immune under the Foreign Sovereign Immunity Act ("FSIA"). They have also moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because Odhiambo's complaint does not contain allegations that fall within any of the exceptions to the FSIA, defendants are entitled to

sovereign immunity, and the Court will dismiss the case for lack of subject matter jurisdiction. Therefore, it need not reach the Rule 12(b)(6) issue.

## BACKGROUND

The following facts are taken from the complaint, and defendants do not dispute them for the purposes of this motion. Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss [Dkt. # 14-1] ("Defs.' Mem.") at 5 n.4. In 2003, Charterhouse Bank, a private Kenyan commercial bank, hired Odhiambo as an internal auditor. Am. Compl. [Dkt. # 13] ¶ 9. In the course of his employment, Odhiambo discovered that several accounts were being operated in violation of certain Kenyan laws, including Kenyan tax laws. *Id.* He notified Charterhouse's management of the illegal activities, but the bank's Managing Director told him not to write any reports on the suspicious accounts or transactions. *Id.*

In March of 2004, Odhiambo learned about the following "Information Reward Scheme" that was being advertised in Kenya's print and online newspapers:

> Kenya Revenue Authority[1] wishes to draw the public's attention to a scheme that rewards persons who provide information as below:
>
> - Information leading to the *identification* of hitherto undisclosed taxes – a reward amounting to 1% of the tax identified up to a maximum of Ksh. 100,000.
>
> - Information leading to the *recovery* of hitherto undisclosed taxes – a reward amounting to 3% of the taxes collected.
>
> Volunteers are assured of strict confidentiality to safeguard identities while information supplied is meticulously vetted to discourage vendetta.
>
> Be patriotic – share knowledge on tax evasion and earn rewards!

*Id.* ¶ 10; Ex. A to Am. Compl. In April and May of 2004, Odhiambo provided account activity reports for over 800 of Charterhouse's customers that he believed had evaded taxes to the KRA,

---

1 The KRA is Kenya's equivalent of the United States Internal Revenue Service. *See* Am. Compl. ¶ 10.

the Kenya Anti-Corruption Commission, and the Central Bank of Kenya. Am. Comp. ¶¶ 11–12. In May of 2004, the KRA paid Odhiambo 200,000 Kenyan shillings, approximately $2,568, which the KRA described as a token of appreciation for the information he provided. *Id.* ¶ 13.

In August of 2004, Kenya's then-Minister of Finance created a task force to investigate Charterhouse's activities based on the information that Odhiambo had provided. *Id.* ¶ 14. Odhiambo was hired as a consultant to assist the task force and was paid by the Kenya Anti-Corruption Commission for his services. *Id.* In November of 2004, a colleague from Charterhouse told Odhiambo that the bank knew that he had provided information to the KRA. *Id.* ¶ 15. The colleague also stated that some of the bank's customers were paying kickbacks to the Minister of Finance and KRA officials to avoid prosecution for tax evasion. *Id.* Shortly after that, Odhiambo began receiving "disquieting calls telling him to leave Kenya." *Id.* However, the calls stopped in February of 2005, when the Central Bank of Kenya hired Odhiambo as an advisor. *Id.* Odhiambo suspects that it was someone at the KRA or the Kenya Anti-Corruption Commission who revealed his identity as an informant to Charterhouse or its customers. *Id.*

On November 30, 2004, the task force investigating Charterhouse issued a report that confirmed Odhiambo's information regarding the failure to pay taxes by some of the bank's customers. *Id.* ¶ 16. About six months later, on June 13, 2005, the KRA paid Odhiambo 250,279.20 Kenyan shillings, approximately $3,282. *Id.* ¶ 18. The KRA described this payment as "Odhiambo's dues" from the tax recovered from one of the accounts that he disclosed. *Id.* But the KRA did not specify the account in question or the total amount of taxes recovered from that account. *Id.* In March of 2006, the Central Bank of Kenya advised the Minister of Finance that its investigation had uncovered "significant tax evasion" at Charterhouse. *Id.* ¶ 19. A

Ministry of Finance official then reported these findings to the Parliament of Kenya, and Charterhouse was placed under statutory management on June 26, 2006. *Id.* ¶¶ 20–22.

Subsequently, the statutory manager of Charterhouse commissioned PricewaterhouseCoopers ("PwC") to conduct an independent investigation of the bank's operations. *Id.* ¶ 23. According to the complaint,[2] this investigation showed that "money was flowing from the Cook Islands through Charterhouse in Kenya to New York and other destinations." *Id.* ¶ 24. One account showed "suspicious transfers of $950,000 in March 2005, $760,000 in January 2006 and $400,000 in February 2006 to the Wall Street Banking Corporation in New York." *Id.*

In July of 2006, five police officers confronted Odhiambo while he was at work in the Central Bank of Kenya with what he calls a "bogus warrant." *Id.* ¶ 25. The then-acting Central Bank Governor rejected the warrant, and allowed Odhiambo to escape. *Id.* "Fearing further police harassment, Odhiambo called the [Kenya Anti-Corruption Commission], the Daily Nation (one of Kenya's major daily newspapers) and the Kenya National Commission on Human Rights." *Id.* After the Daily Nation published a story about his role as a whistleblower, the threats he had received, and the police harassment, "Odhiambo began receiving threatening phone calls warning him to leave Kenya and suspicious people were seen lurking around his house." *Id.* ¶ 26. As a result of these telephone calls and "hostile surveillances," Odhiambo "sought protection for his family in the United States, changed his cell phone number, and changed his residence twice." *Id.*

On July 19, 2006, the head of the Kenya National Commission on Human Rights contacted the U.S. Embassy to seek protection for Odhiambo, and that same month, Odhiambo

---

2       All references to the "complaint" are to the amended complaint.

met with U.S. embassy officials in Nairobi to discuss his asylum application. *Id.* ¶¶ 28–29. While discussions regarding his relocation were ongoing, Odhiambo received a letter from the KRA thanking him for the tax information that he provided and stating that he would receive his reward as soon as the KRA finalized its investigations. *Id.* ¶ 31. On August 15, 2006, Odhiambo traveled to Tanzania to await the processing of his application for refugee status in the United States. *Id.* ¶ 32. He stayed there for one and a half months at the full expense of the U.S. government. *Id.* Odhiambo arrived in the United States as a refugee on September 26, 2006, and the U.S. government paid his living expenses for ninety days after he arrived in the country. *Id.* ¶ 34.

In 2008 and 2009, Odhiambo had a number of meetings with Kenyan government officials in the United States about his "unpaid Information Reward Claim." *Id.* ¶¶ 35–36, 38–39. On June 18, 2008, he met with the Prime Minister's Chief of Staff for several hours in Maryland to discuss the reward payment. *Id.* ¶ 36. Later that month, the Chief of Staff called him from Kenya and told him to provide the KRA with a sworn statement describing the information he provided to the Kenyan government about tax evasion. *Id.* ¶ 37. Odhiambo complied with this request. *Id.* The following year, on September 24, 2009, Odhiambo met with the Kenyan Prime Minister in New York to discuss his claim for a reward payment. *Id.* ¶ 39. A year later, the KRA Commissioner General announced that Charterhouse had complied with the Kenya Income Tax Act's requirements and that he had no problem with reopening the bank. *Id.* ¶ 41. On November 30, 2011, Odhiambo sent "a final demand letter and notice of his intent to sue the Defendants." *Id.* ¶ 42. The Republic of Kenya and the KRA acknowledged receipt of his letter, and in their letters of acknowledgement, they both pledged to get back to Odhiambo at a later date. Exs. Q and R to Am. Compl.

On March 21, 2012, Odhiambo filed this suit against defendants; he amended his complaint in July of 2012.  He alleges that by advertising the reward scheme, defendants offered to pay him for information leading to the identification and/or recovery of undisclosed taxes and promised to keep his identity as a whistleblower confidential, and that he accepted that offer by providing the requested information.  *See* Am. Compl. ¶¶ 46–55.  Count I alleges that defendants breached the contract by failing to pay the full reward amount of $24,533,683.  *Id.* ¶¶ 46–51.  Count II alleges that defendants also breached the contract by disclosing Odhiambo's role as a whistleblower, and it seeks a payment of $5 million in compensatory damages.  *Id.* ¶¶ 52–55.  Defendants have moved to dismiss this action under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on the basis of sovereign immunity under the FSIA, and 12(b)(6) for failure to state a claim.  Defs.' Mot. to Dismiss [Dkt. # 14] ("Defs.' Mot.").

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true, . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). Because "subject-matter jurisdiction is an 'Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm.*, *Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

"In the United States, there is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one – the FSIA." *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see also* 28 U.S.C. §§ 1604–05 (2006). The exceptions listed in 28 U.S.C. § 1605 provide "the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Nelson*, 507 U.S.

7

at 355, quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) (internal quotation marks omitted).  In other words, American courts cannot hear a case brought against a foreign sovereign *unless* one of the exceptions applies.

Odhiambo does not dispute that the Republic of Kenya, the Kenya Ministry of Finance, and the Kenya Revenue Authority are "foreign states" within the meaning of the FSIA.  But he asserts that the Court has jurisdiction over them based on the first two exceptions of the FSIA:  the waiver exception, 28 U.S.C. § 1605(a)(1); and the commercial activity exception, *id.* § 1605(a)(2).  Pl.'s Resp. to Defs.' Mot. to Dismiss [Dkt. # 17] ("Pl.'s Opp.") at 4.  He also contends that FSIA immunity is not available to the individual defendants because they are not "foreign states" under the Act and therefore, the Court has jurisdiction over them under "common law."  *Id.*

## I.   This Case Does Not Fall Within Any Exceptions in the FSIA

### A.  Defendants Have Not Implicitly Waived Their Sovereign Immunity

Odhiambo asserts that the Court has jurisdiction over defendants because they have implicitly waived their sovereign immunity.  Pl.'s Opp. at 5; Am. Compl. ¶ 28.  Under 28 U.S.C. § 1605(a)(1), "a state is not immune from suit in any case 'in which the foreign state has waived its immunity either explicitly or by implication.'"  *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1161 (D.C. Cir. 2002).  "The legislative history of FSIA gives three examples of circumstances in which courts have found implied waivers:  (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity."  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990), citing S. Rep. No. 94-1310, at 18 (1976);

H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.  These three examples demonstrate that the theory of implied waiver contains an intentionality requirement, and that a finding of "an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit."  *See Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1174 (D.C. Cir. 1994).  Further, "'[s]ince the FSIA became law, courts have been reluctant to stray beyond these [three] examples when considering claims that a nation has implicitly waived its defense of sovereign immunity.'"  *Id.* (first alteration in original), quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985).

Odhiambo does not argue that defendants' actions fall within one of the three accepted examples of implied waiver:  he does not assert that defendants agreed to arbitration in the United States; that the reward scheme stated that U.S. law governed the offer; or that defendants failed to assert the defense of sovereign immunity in their responsive pleadings.  Rather, he argues that defendants implicitly waived their immunity by helping him seek asylum in the United States:  "Since the 'processing' of Plaintiff for admission into the United States was an adjudicatory process under the U.S. Refugee Act of 1980, Defendants implicitly agreed for their obligation to protect Plaintiff to be governed by U.S. law.   Under these circumstances, Defendants implicitly waived their immunity . . . ."  Pl.'s Opp. at 5.   But Odhiambo acknowledges in his own pleading that defendants did not "process" his asylum application under the U.S. Refugee Act; the United States did.  *See id.* at 5.  Since defendants did not engage in any "adjudicatory process" under U.S. law, they cannot be said to have agreed to any obligations under U.S. law or waived their immunity.

More importantly, defendants' alleged actions in connection with Odhiambo's relocation to the United States cannot support a finding of implied waiver because they were not related to

any "conduct of litigation," let alone this one. *See Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 178 (D.D.C. 2006), quoting *Smith ex rel. Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 244 (2d Cir. 1996) ("Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's actions in relation to the conduct of litigation."). This matter is not about Odhiambo's asylum in the United States; his relocation occurred more than five years before Odhiambo filed this suit, and Odhiambo has not pointed to any action taken by defendants "in relation to the conduct of litigation" that indicated their amenability to suit in the United States.

The only case that Odhiambo cites to support his novel theory of implied waiver is *Marlowe v. Argentine Naval Commission*, 604 F. Supp. 703 (D.D.C. 1985). Pl.'s Opp. at 5. In that case, the court held that the state had implicitly waived its immunity by "stipulating that its contract with plaintiff's assignor 'shall be governed by and construed in accordance with the laws of the District of Columbia.'" *Marlowe*, 604 F. Supp. at 708. But the contract at issue in this case, the reward offer, does not contain a choice of law or forum selection clause that involves U.S. law. Therefore, *Marlowe* does not alter the Court's conclusion that defendants did not implicitly waive their immunity.

B.  <u>Defendants' Actions Do Not Fall Within the "Commercial Activity" Exception</u>

Odhiambo also asserts that the Court has jurisdiction over defendants under all three clauses of the "commercial activity" exception. Pl.'s Opp. at 4–16. Under this exception,

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).   Since all three clauses require the Court to identify the relevant "commercial activity" at issue, the Court will address this threshold issue first.

     *1.   Is "Commercial Activity" at Issue in this Case?*

     The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act.   The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."   28 U.S.C. § 1603(d).   The Supreme Court has explained that:

> This definition, however, leaves the critical term "commercial" largely undefined:   The first sentence simply establishes that the commercial nature of an activity does *not* depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality (*i.e.*, nature rather than purpose), but still without saying what "commercial" means.

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 612 (1992).   After reviewing the historical and legislative history of sovereign immunity, the Supreme Court concluded that a state engages in commercial activity when it exercises "only those powers that can also be exercised by private citizens," as opposed to those "powers peculiar to sovereigns."   *Id.* at 614.   More specifically,

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA.   Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting . . . with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce," Black's Law Dictionary 270 (6th ed. 1990).

*Id.*

In *Guevara v. Republic of Peru*, 468 F.3d 1289, 1299 (11th Cir. 2006), the Eleventh Circuit found that a foreign state's offer of a reward in return for information enabling it to locate and capture a fugitive constituted "commercial activity." The court reasoned that instead of using its own police and investigatory resources to locate the fugitive, the state "'ventured into the marketplace,' to buy the information needed to get its man. The underlying activity at issue – the exchange of money for information – is 'commercial in nature and of the type negotiable among private parties.'" *Id.* (citation omitted).

This same reasoning could apply here because this case also involves the sort of exchange of money for information that could be as easily accomplished by private parties as by a governmental entity. There are some differences between *Guevara* and this case, though. In *Guevara*, the court rejected the argument that the sovereign act of capturing the fugitive was a condition precedent to the earning of the reward: the state offered a lump sum for information about the fugitive, and it did not require actual capture before paying the reward amount. *Id.* By contrast, in this case, the reward due to Odhiambo was to be calculated as a percentage of the unpaid taxes identified as well as a percentage of those actually recovered by the Kenyan government. Therefore, it was arguably conditioned upon the sovereign activity of determining what taxes are owed and of collecting those taxes. But the Court does not need to decide this issue because even if one assumes that the reward scheme was entirely commercial, Odhiambo's claims do not fall within any of the three commercial activity exceptions listed in section 1605(a)(2).

2.  *Clause One of Section 1605(a)(2) Does Not Grant the Court Subject Matter Jurisdiction*[3]

Under the first clause of 28 U.S.C. § 1605(a)(2), a state is not immune where the action is "based upon a commercial activity carried on in the United States by the foreign state." Odhiambo asserts that this exception applies for two reasons.  First, he alleges that Charterhouse Bank was an organ of Kenya, and that the calculation of damages in this case is partly "based upon commercial activity worth $2,110,000.00 carried out by Charterhouse Bank in the United States."  Pl.'s Opp. at 6–7.  Second, he contends that he held several meetings with defendants in the United States to discuss "the underlying commercial contract."  *Id.* at 6.  These arguments fail because Odhiambo's claims are not "based upon" those activities.

   i.  Legal standard for "based upon"

The phrase "based upon" is "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).  In *Kirkham v. Société Air Fr.*, 429 F.3d 288, 292 (D.C. Cir. 2005), the D.C. Circuit Court clarified that the term "elements" as used in *Nelson* should be read "as referring to *each fact necessary* to establish a claim.  In other words, so long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies."

In *Nelson*, an American employee of a Saudi hospital brought a tort action against the Kingdom of Saudi Arabia seeking damages for injuries he allegedly suffered when he was

---

3    Odhiambo's complaint does not allege that the first clause of section 1605(a)(2) applies to this case.  *See* Am. Compl. ¶ 8 (arguing that the Court has jurisdiction under the second two clauses of section 1605(a)(2)); *see also* Defs.' Mem. at 8–9; Defs.' Reply in Supp. of Mot. to Dismiss [Dkt. # 19] ("Defs.' Reply") at 6.  But in his opposition memorandum, Odhiambo argues that the facts in the complaint are sufficient to support a finding that the first exception in section 1605(a)(2) applies.  Pl.'s Opp. at 6–8.  Since both parties have briefed this issue, the Court will assess the sufficiency of the evidence proffered by Odhiambo under this exception as well.

falsely imprisoned and tortured by the Saudi government. *Nelson*, 507 U.S. at 352–54. The Court concluded that although the plaintiff's recruitment and hiring, which took place in the United States, "led to the conduct that eventually injured the Nelsons, they are not the basis for the Nelsons' suit." *Id.* at 358. Rather, it held that Saudi Arabia's "torts, and not the arguably commercial activities that preceded their commission, form the basis for the Nelsons' suit." *Id.* Since the plaintiffs in *Nelson* did not allege a breach of contract, the fact that the defendants recruited the plaintiff in the United States had no bearing upon the plaintiff's entitlement to damages in that case. *Id.*

In *Kirkham*, the plaintiff purchased an Air France ticket in the United States and injured her foot in a Paris airport while making a connection to her final destination. 429 F.3d at 290. She sued Air France for negligence asserting that "the ticket sale established a passenger-carrier relationship, which imposed a duty on Air France to provide" her with safe passage between Paris and her final destination. *Id.* The D.C. Circuit held that the plaintiff's claim was "based upon" the purchase of her airline ticket because the plaintiff "*must* show she purchased a plane ticket in order to establish a passenger-carrier relationship with the airline, [and therefore] the ticket sale is necessary to the 'duty of care' element of her negligence claim." *Id.* at 282 (citation omitted). Since the plaintiff purchased the ticket in the United States, the court had jurisdiction over her claim under the first clause of the commercial activity exception. *Id.* at 292–93.

     ii.  <u>Clause One does not apply because Odhiambo's claims are not "based upon" Charterhouse Bank's alleged U.S. activities or his meetings with Kenyan government officials in the United States</u>

This is a breach of contract case. To establish a breach of contract, Odhiambo must show "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984

A.2d 181, 187 (D.C. 2009).   The essence of Odhiambo's claims is that:  (1) by advertising the reward scheme, defendants offered to pay him for information leading to the identification and/or recovery of undisclosed taxes and promised to keep his identity as a whistleblower confidential; (2) Odhiambo accepted that offer by providing the requested information; (3) defendants breached the contract by failing to pay the reward and by disclosing his identity; and (4) he has been harmed as a result of the breach.   Am. Compl. ¶¶ 47–55.   All of the aspects of Odhiambo's breach of contract claims took place in Kenya:  the reward scheme was advertised in "Kenya's print and online newspapers," *id.* ¶ 10; the reward was to be paid in Kenyan Shillings, *id.*; Odhiambo "accepted" the offer by providing information in Kenya, *id.* ¶ 48; defendants allegedly disclosed Odhiambo's identity as a whistleblower in Kenya, *id.* ¶ 55; and defendants allegedly paid Odhiambo less than he was owed while he was in Kenya, *id.* ¶¶ 13, 18.

Despite the occurrence of all of these events in Kenya, Odhiambo still submits that Clause One applies because of Charterhouse's commercial activities in the United States.  Pl.'s Opp. at 6–8.  But this is not a suit against Charterhouse, or even against the state for activities undertaken by Charterhouse as a state-owned entity.  And these alleged commercial activities in the United States do not form the basis of Odhiambo's action.  *Kirkham* is distinguishable because Charterhouse's alleged diversion of approximately $2.11 million from Kenya to New York is not necessary to prove any of the elements of breach of contract.[4]  It is not relevant to the determination of whether there was a valid contract between the parties or whether an obligation or duty arose from the contract.  It is also not necessary for the Court's determination of whether

---

[4]      The first clause requires the "commercial activity" in question to be carried on "*by the foreign state*."  28 U.S.C. § 1605(a)(2) (emphasis added).  In order to address Odhiambo's argument that Charterhouse's U.S.-based commercial activities form the basis of his claim, the Court will assume without deciding that Charterhouse is an "organ" of Kenya and its actions can thus be attributed to defendants.

there was a breach of the contract because whether Charterhouse diverted money to the United States does not establish whether defendants disclosed Odhiambo's identity as a whistleblower or whether they failed to pay him the reward money.

Odhiambo asserts that Charterhouse's diversion of funds to this country is relevant to the calculation of damages because "he is entitled to a portion of the amount of taxes Defendants collected as a result of tax evasion information he gave them."  Pl.'s Opp. at 6.  The calculation of this percentage depends solely upon the total amount of taxes identified to Kenya in Kenya by Odhiambo or recovered by Kenya in Kenya from the bank based upon Odhiambo's information; it does not matter what means was utilized to effect the underlying evasion.   Moreover, Odhiambo does not even allege that the Kenyan government "collected" any taxes based on the funds that Charterhouse diverted to the United States.  And, as noted above, Odhiambo is not suing Charterhouse.   So, the Court cannot find that Charterhouse's U.S.-based commercial activity is necessary to prove damages, or that Odhiambo's suit is "based upon" that activity.

Similarly, Odhiambo's meetings with Kenyan officials in the United States to discuss the reward scheme do not form the basis of his claims.  The fact that he discussed the reward scheme with Kenyan officials does not establish any element of the breach of contract action, and it does not, in and of itself, entitle him to relief based on his theory of the case.  Therefore, these meetings do not support a finding that the FSIA exception under the first commercial activity clause applies in this case.

   *3. Clause Two of Section 1605(a)(2) Does Not Grant the Court Subject Matter Jurisdiction*

Odhiambo next contends that his suit falls within the second clause of the commercial activity exception.  Pl.'s Opp. at 11.  Under this clause, a state is not immune where the action is (1) based upon an act performed in the United States (2) in connection with a commercial

activity of the foreign state elsewhere.  28 U.S.C. 1605(a)(2).  In an attempt to meet the first

requirement, Odhiambo lists the following U.S. based acts:

> (i) Defendant Kenya requested the United States to protect Plaintiff; (ii) Defendant Kenya (through its "organ" Charterhouse Bank) effected substantial illicit money transfers directed to New York on several occasions; (iii) Defendants, through the Prime Minister of Kenya, his Chief of Staff and two U.S. private individuals held extensive face to face and telephonic discussions with Plaintiff in the United States in 2008 and 2009; (iv) Defendants asked Plaintiff to prepare a statement sworn under United States law; and (v) Defendants Kenya (through its Attorney General) and KRA (through the head of its Legal Services Division) conducted negotiations over telephone, email and regular mail with Plaintiff in the United States.

*Id.*

Defendants argue that these acts are insufficient to meet the requirements of Clause Two

because "none of them <u>form the basis for his claims</u>."  Defs.' Mem. at 11 (emphasis in original).

In response, Odhiambo asserts that "[s]ince *Nelson* and *Kirham* [sic] are Clause One decisions

and *Adler* has clarified that the 'based upon' nexus applies only to Clause One, Defendants'

argument that the acts they performed in the United States in connection with the commercial

contract they entered into with Plaintiff in Kenya do not <u>form the basis for his claims</u> is

irrelevant to Clause Two."  Pl.'s Opp. at 10 (emphasis in original).  According to Odhiambo,

Clause Two only requires him to show that "the U.S. acts enumerated in the Complaint are in

connection with the underlying commercial activity – his commercial contract with Defendants –

that form[s] the basis of his claim."  *Id.* at 9.  This assertion is incompatible with the plain

language of the statute and mischaracterizes *Adler v. Federal Republic of Nigeria*, 107 F.3d 720

(9th Cir. 1997).

Clause Two explicitly only applies to a "case . . . in which the action is *based . . . upon* an

act performed in the United States."  28 U.S.C. § 1605(a)(2) (emphasis added).  The legislative

history further explains that "the acts (or omissions) encompassed in this category are limited to

those which in and of themselves are sufficient to form the basis of a cause of action."  S. Rep.

No. 94-1310, at 18 (1976); H.R. Rep. No. 94-1487, at 19 (1976), *reprinted in* 1976

U.S.C.C.A.N. 6604, 6618.  Although *Nelson* was a "Clause One decision," the Court specifically

noted that all three clauses of section 1605(a)(2) used the same term.  507 U.S. at 357 (stating

that "the natural meaning of the phrase 'based upon'" is confirmed by its use in Clauses Two and

Three).  Further, the court in *Adler* recognized that in *Nelson*, the

> [Supreme] Court noted that Congress made an important distinction
> between the first clause of section 1605(a)(2) and the second and third
> clauses.  The Court explained:  "Congress manifestly understood there to
> be a difference between a suit 'based upon' commercial activity and one
> 'based upon' acts performed 'in connection with' such activity."  Adler's
> claims need not be "based upon" commercial activity; they must merely
> be *based upon acts* made "in connection with" such activity.

*Adler*, 107 F.3d at 726, (emphasis added) quoting *Nelson*, 507 U.S. at 358.

Therefore the plain language of the statute and the holdings in *Nelson* and *Adler*

demonstrate that although the second clause does not require Odhiambo's action to be "based

upon" the foreign state's commercial activity, it does require it to be "based upon" the acts that

he alleges were performed in the United States.  Additionally, the fact that the three clauses

require the suit to be "based upon" different predicate acts does not change the meaning of

"based upon" as applied to the second or third clauses.  *See Powerex Corp. v. Reliant Energy

Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides

that identical words and phrases within the same statute should normally be given the same

meaning.").

None of the U.S.-based acts that Odhiambo lists to support his Clause Two argument

form the basis of this action.  Specifically, proving that defendants helped him obtain asylum in

the United States, that Charterhouse diverted money to the United States,[5] that he discussed the reward payment with Kenyan officials, and that he prepared a sworn statement about the tax evasion information he had previously provided to the Kenyan government while he was here "would [not] entitle [] plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357. And none of these acts constitute "fact[s] without which the plaintiff will lose" his case. *Kirkham*, 429 F.3d at 292.  In fact, because of Odhiambo's erroneous reading of Clause Two, he concedes that his

> [P]osition under Clause Two is not that his claim was triggered by the U.S. acts he enumerated in the Complaint.  Plaintiff's position, however, is that the U.S. acts enumerated in the Complaint are in connection with the underlying commercial activity – his commercial contract with Defendants – that form[s] the basis of his claim.

Pl.'s Opp. at 9.  The Court agrees with Odhiambo that "his commercial contract with Defendants . . . form[s] the basis of his claim" and not the listed U.S.-based acts.  Since Odhiambo has also acknowledged that this commercial contract occurred in Kenya, *id.* at 10–11, Clause Two does not apply to this case.

---

5      Odhiambo also asserts that the decision in *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 709 (9th Cir. 1992), supports his argument that Charterhouse's diversion of funds to the U.S. meets the requirements of Clause Two.  Pl.'s Opp. at 11.  The Court disagrees.  In *Siderman*, the plaintiffs brought a conversion claim against Argentina for expropriating their hotel and keeping the revenue derived from it.  965 F.2d at 709.  The court held that since the Argentinian government solicited guests for the hotel through a U.S. agent and accepted payment for hotel reservations in the U.S., the plaintiffs' conversion claim fell "squarely within clause two of the commercial activity exception."  *Id.* at 710.  Unlike *Siderman*, Odhiambo is not claiming that the funds that Charterhouse diverted to the U.S. belong to him, that defendants solicited information about tax evasion through U.S. newspapers, or that they paid informants in the U.S.  Thus, *Siderman* does not alter the Court's conclusion that this action is not "based upon" Charterhouse's commercial activities because that case is easily distinguishable, and it was decided before the Court defined the term "based upon" in *Nelson*.

4. *Clause Three of Section 1605(a)(2) Does Not Grant the Court Subject Matter Jurisdiction*

Under the third clause of the commercial activity exception, a state is not immune where "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. 28 U.S.C. § 1605(a)(2). For this clause to apply, a number of requirements have to be met: (1) Odhiambo has to identify an act that occurred outside of the United States; (2) his claims have to be "based upon" that act; (3) that act has to be "in connection with" the foreign state's commercial activity; and (4) the complained-of act – not the commercial activity – has to cause a "direct effect" in the United States. *See id.* Odhiambo meets the first three requirements: defendants' alleged act of breaching the reward contract took place outside the United States; his action is "based upon" that breach; and the contractual breach is "in connection with" defendants' commercial activity – the reward offer. *See* Pl.'s Opp. at 12. However, he fails to meet the final requirement because he has not demonstrated that the contractual breach caused a "direct effect" in the United States.

i.   Requirements for "direct effect" under the FSIA

The Supreme Court has instructed that for FSIA purposes, a direct effect "follows as an *immediate* consequence of the defendant's . . . activity." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (emphasis added) (internal citation and quotation marks omitted). The FSIA does not permit jurisdiction over foreign sovereigns when the complained-of effects are attenuated, remote, or speculative. *See id.* A direct effect "'is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.'" *Princz v. Fed. Republic of Ger.*, 26 F.3d 1166, 1172 (D.C. Cir. 1994), quoting *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd*, 607 F.2d 494 (D.C. Cir. 1979); *Bao Ge v. Li Peng*, 201 F.

Supp. 2d 14, 24 (D.D.C. 2000), *aff'd*, 35 F. App'x 1 (D.C. Cir. 2002).  Thus, as the D.C. Circuit

explained in *Princz*, and another court in this district reiterated in *Bao Ge*, an effect is not direct

if "[m]any events and actors necessarily intervened" between the act perpetrated overseas and

the impact felt here.  *Princz*, 26 F.3d at 1172; *Bao Ge*, 201 F. Supp. 2d at 24.

 In *Weltover*, bond holders brought a breach of contract action against the Republic of

Argentina based on Argentina's unilateral extension of the payment date on bonds that it issued

as part of its currency stabilization plan.  504 U.S. at 609–10, 618–19.  The Supreme Court held

that Argentina's rescheduling of payment dates for the bonds had a "direct effect" in the United

States because:  (1) the contract between the parties explicitly allowed the bond payees to choose

the place of payment; (2) the payees "had designated their accounts in New York as the place of

payment"; and therefore (3) "[m]oney that was supposed to have been delivered to a New York

bank for deposit was not forthcoming."  *Id.* at 609–10, 619.  After *Weltover*, courts have looked

for a direct economic impact here, and they have been inclined to find it only in limited

circumstances.  "As a factual matter . . . in almost every case, in this circuit and others, involving

the direct effect exception, the existence or absence of an expressly designated place of payment

has been decisive. . . . [W]ithout an express designation of the United States as the place of

payment, courts have refused to find a direct effect."  *Global Index, Inc. v. Mkapa*, 290 F. Supp.

2d 108, 113–14 (D.D.C. 2003), citing *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146–

47 (D.C. Cir. 1994).

  ii. <u>Odhiambo's relocation to the United States was not a "direct effect" of
defendants' alleged contractual breach</u>

 Odhiambo asserts that his relocation to the United States gives rise to a "direct effect"

here.  But his assertion that the relocation was an "immediate consequence" of defendants'

breach of contract with "no intervening element" is inconsistent with the allegations in his own

complaint.  In the complaint, Odhiambo alleges that although the reward scheme "assured []  strict confidentiality to safeguard identities" of whistleblowers, Kenyan government officials  breached that promise by revealing his identity as an informant to Charterhouse.  Am. Compl.  ¶¶ 10, 15.  As a result of this contractual breach, Odhiambo "began receiving disquieting calls  telling him to leave Kenya," *id.* ¶ 15, and was harassed by the police with a "bogus warrant," *id.*  ¶ 25.  But in both instances, his relationship with the Central Bank of Kenya ("CBK") protected  him from harm:  the "disquieting calls" stopped when the CBK hired him, *id.* ¶ 15, and the  Acting CBK Governor protected him from the "bogus warrant," *id.* ¶ 25.

According to the complaint, the events that led Odhiambo to seek asylum in the United  States occurred after he decided to reveal his identity as the whistleblower in the Charterhouse  Bank investigation to one of Kenya's major daily newspapers.  *Id.*  Odhiambo explains that after  the publication of his story, he "began receiving threatening phone calls warning him to leave  Kenya and suspicious people were seen lurking around his house."  *Id.* ¶ 26.  "Because of the  calls and apparently hostile surveillances, Odhiambo sought protection for his family in the  United States, changed his cell phone number, and changed his residence twice."  *Id.*  This  chronology demonstrates that Odhiambo's relocation to the United States was not "an immediate  consequence" of defendants' alleged disclosure of his identity as a whistleblower.  Rather, there  were a number of intervening events – including his own decision to disclose his identity as an  informant to a major newspaper and the newspaper's publication of that information.[6]

---

6    Odhiambo also alleges that Kenya's request that the U.S. grant him asylum had a "direct  effect" in the U.S.  Pl.'s Opp. at 15.  But again, Odhiambo's breach of contract claims are not  "based upon" that request – he is not arguing that defendants contracted to help him relocate to  the U.S. and then breached that contract.  *See* 28 U.S.C. § 1605(a)(2) (stating that to fall within  the third exception, the foreign act that forms the basis of the plaintiff's suit must have a "direct  effect" in the U.S.).  So whether Kenya's request had a "direct effect" in the U.S. is not relevant.

iii. Odhiambo's relocation to the United States did not constitute an implicit agreement to make the reward payable in the United States

Odhiambo contends that defendants' contractual breach had a "direct effect" in the United States because "implicit in Defendants' express designation of the United States as the place for Plaintiff's protection is that the rest of Defendants' contractual obligations, including payment, were consequently supposed to be performed in the United States." Pl.'s Opp. at 13. This does not suffice to meet the "direct effects" test.

In *Goodman Holdings*, the D.C. Circuit determined that the plaintiffs' suit to recover payments due on letters of credit issued in their favor by branches of the Iraqi government did not meet the "direct effects" test because "[n]either New York nor any other United States location was designated as the 'place of performance' where money was 'supposed' to have been paid" by the Iraqi government or to the plaintiffs. 26 F.3d at 1146. Rather, Iraq "might well have paid [plaintiff] from funds in United States banks but it might just as well have done so from accounts located outside of the United States, as it had apparently done before." *Id.* at 1146–47.

In *Global Index*, the plaintiff brought an action against Tanzania and its officials for their failure to honor promissory notes issued by the government of Zanzibar. 290 F. Supp. 2d at 109. The court interpreted the holding in *Goodman Holdings* as leaving "open the possibility that a court could find a 'direct effect' based upon a non-express agreement to pay in the United States." *Id.* at 114. Nonetheless, the court concluded that there were no "direct effects" of the alleged breach based on an implied or constructive agreement to pay in the U.S.

> Plaintiff points to no evidence, or even potential evidence to be uncovered in discovery, that tends to show that the parties had even impliedly agreed on payment in the United States . . . . The fact that a U.S. citizen or entity suffers a loss does not suffice to prove a direct effect in the United States. Neither does the designation of payment in U.S. currency satisfy the direct effect requirement. Finally, plaintiff does not argue that Tanzania has *ever*

paid note-holders in the United States, much less made a consistent practice of paying in the U.S.

*Id.* at 115 (citations omitted).

Similarly, here, Odhiambo has failed to show that the United States was the "place of performance" where the reward payment was "supposed" to be made by defendants or to Odhiambo.  Contrary to his assertions, defendants' agreement to help Odhiambo relocate to the United States did not necessarily indicate their implicit agreement to designate the United States as the place of performance for the reward scheme.  As in *Goodman Holdings*, defendants might have paid Odhiambo in the United States, but they might just as well have done so in Kenya and left it up to him to transfer the funds to his U.S. accounts.[7]  Moreover, Odhiambo does not allege that Kenya paid whistleblowers in the United States or that it had a practice of paying whistleblowers based on their location.[8]  *See Goodman Holdings*, 26 F.3d at 1147 & n.3.  Unlike in *Weltover*, where the plaintiff had the right to designate the place of performance, here Odhiambo does not allege that the contract expressly allowed him to choose the location of the payment.  So, as in *Global Index*, "there is no direct effect if the creditor-plaintiff chooses,

---

[7]    Odhiambo argues that "KRA, being the offerer, was free to include a forum selection clause if it wished to be free from the possibility of adjudication or enforcement of the offer in the United States."  Pl.'s Opp. at 14.  But the absence of a forum selection clause by itself does not strip defendants of their sovereign immunity.  *See Goodman Holdings*, 26 F.3d at 1145–47 (analyzing whether the foreign state was entitled to immunity without discussing the presence or absence of a forum selection clause).

[8]    To support his assertion that defendants have implicitly agreed that the place of payment would correspond with his location, Odhiambo alleges that "KRA paid Plaintiff KShs. 250,279.20 ($3429.79) while Plaintiff was in Tanzania."  Pl.'s Opp. at 14.  This allegation directly contradicts the complaint, which states that this payment was made on June 13, 2005, Am. Compl. ¶ 18, and that Odhiambo did not leave for Tanzania until August 15, 2006, *id.* ¶ 32.  The complaint attaches a copy of the check but that copy does not show the date on the check or where it was mailed.  *See* Ex. F to Am. Compl.  Odhiambo bears the burden of proving subject matter jurisdiction, and this exhibit does not show that defendants agreed that the place of performance for the reward scheme would correspond to Odhiambo's location.

unilaterally, the U.S. as a place of payment without any prior agreement with the debtor."  290 F. Supp. 2d at 115.[9]

    iv.  <u>Odhiambo's remaining theories of "direct effect" are also unpersuasive</u>

Odhiambo submits that Charterhouse's "illicit transfers to New York" constitute a "direct effect" in the United States.  To meet the requirements of Clause Three, Odhiambo has to demonstrate that the foreign act – defendants' contractual breach – had "immediate consequences" in the United States.  Charterhouse's alleged illicit transfers in furtherance of their tax evasion scheme do not meet this requirement because Odhiambo has failed to demonstrate or even allege that this activity occurred as an "immediate consequence" of defendants' contractual breach.  Finally, Odhiambo asserts that defendants' "extensive face to face and telephonic discussions [and negotiations] with Plaintiff in [the] United States" constitute "direct effects" in the United States because defendants "suggested and facilitated Plaintiff's relocation here."[10]  Pl.'s Opp. at 15–16 (emphasis omitted).  But these negotiations and discussions were not an "immediate consequence" of defendants' contractual breach.  There were a number of intervening elements including the publication of Odhiambo's story, the calls and hostile surveillance, and Odhiambo's relocation to the United States.  Moreover, these were just events that occurred in the United States, not the sort of economic impacts that constitute

---

9    Odhiambo's presence in the U.S. is also insufficient to show that the alleged failure to pay the reward had a "direct effect" here.  *See Global Index*, 290 F. Supp. 2d at 115 ("The fact that a U.S. citizen or entity suffers a loss does not suffice to prove a direct effect in the United States.").

10    This argument calls for the adoption of a rule whereby a foreign state forfeits its sovereign immunity when it helps its citizen gain refugee protection in another state and then engages in settlement negotiations with that citizen.  *See* Pl.'s Opp. at 16.  But Odhiambo does not provide legal support for this rule, nor does he address its possible negative consequences such as discouraging states from helping their citizens gain refugee status or attempting to settle claims.

"direct effects" in the United States.  So Odhiambo's discussions with Kenyan officials in the United States also fail to meet the "direct effects" test.

**II.      The FSIA Applies to Odhiambo's Suit Against the Individual Defendants**

Odhiambo alleges that under the Supreme Court's analysis in *Samantar v. Yousuf*, 130 S. Ct. 2278 (2010), defendants Njiraini and Waweru should not be considered to be "foreign states," entitled to the immunity provided by FSIA.  Pl.'s Opp. at 4.  In *Samantar*, the Court held that "[r]eading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted."  130 S. Ct. at 2289.  However, the Court also explained that "it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself, as the state is the real party in interest."  *Id.* at 2292, citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity.").  The Court went on to note that "[e]ven if a suit [against a foreign official] is not governed by the Act, it may still be barred by foreign sovereign immunity under the common law."  *Id.*  Applying this analysis, the Court concluded that a case "in which respondents have sued [a foreign official] in his personal capacity and seek damages from his own pockets, is properly governed by the common law because it is not a claim against a foreign state as the Act defines that term."  *Id.*

Thus, to determine whether a suit against a foreign official is governed by the FSIA, this Court must look to whether the suit is against the official personally or whether the state is "the real party in interest."  If the suit is against the official personally, then the common law regarding sovereign immunity applies, but if the state is "the real party in interest," then the suit

should be treated as an action against the foreign state itself to which the FSIA would apply. *See id.*

Odhiambo's suit against the individual defendants will be governed by the FSIA because the suit is in all respects a suit against the Kenyan government. This is a breach of contract case and the only contract at issue is between Odhiambo and the Kenyan government. *See* Am. Compl. ¶ 10 (stating that the reward offer was made by the KRA, not the individual defendants). Further, unlike the plaintiff in *Samantar*, Odhiambo has sued the individual defendants in their official capacities. *Id.* ¶ 7. And any damages that Odhiambo recovers in this suit will be payable by the Kenyan government and not from the individual defendants' "own pockets." *See Graham*, 473 U.S. at 166 ("A plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Therefore, the Kenyan government is "the real party in interest" and the suit against the individual defendants will be treated as one against the Republic of Kenya. The Court's FSIA analysis thus applies to all defendants including the individuals.[11,12]

---

11      Even under pre-FSIA common law regarding head of state and diplomatic immunities, the individual defendants in this case are still entitled to sovereign immunity. Under common law, "it was well settled that sovereign immunity existed for 'any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'" *Belhas v. Ya'alon*, 515 F.3d 1279, 1285 (D.C. Cir. 2008). Again, since the individual defendants are sued in their official capacities, a judgment against them would involve "enforcing a rule of law against the state," and therefore they are entitled to immunity under common law.

## CONCLUSION

Accordingly, the Court concludes that the FSIA applies to all defendants including the individual defendants because the Kenyan government is "the real party in interest" and the suit should be treated as one against the foreign state.   Under the FSIA, a foreign state is presumptively immune from the jurisdiction of U.S. courts unless a specific exception applies. Since Odhiambo has failed to demonstrate that any of the relevant exceptions of the FSIA apply to this case, the Court will dismiss the action under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction on the basis of sovereign immunity.   A separate order will issue.



AMY BERMAN JACKSON
United States District Judge

DATE: March 13, 2013

---

12     A plaintiff bears the burden of proving subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In his complaint, Odhiambo asserts only one basis for jurisdiction over all defendants:  28 U.S.C. § 1330.  Am. Compl. ¶ 8.  But that statute only grants this Court "original jurisdiction . . . of any nonjury civil action against a foreign state as defined in" the FSIA.  28 U.S.C. § 1330(a).  If the Court had decided to treat the suit against Njiraini and Waweru as against the individuals personally and not against the Republic of Kenya, then 28 U.S.C. § 1330 and the FSIA would not apply, and the Court would dismiss the suit against the individual defendants for lack of subject matter jurisdiction because Odhiambo's complaint does not allege any alternative grounds for jurisdiction.  In his opposition, Odhiambo attempts to cure this problem by asserting that the Court has jurisdiction over the individual defendants under "common law," Pl.'s Opp. at 4, but this argument also fails because Odhiambo does not explain how "common law" provides jurisdiction here.